# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATHY THOMPSON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF SOCIAL )<br>SECURITY, )<br>)<br>Defendant. ) | Civil Action No. 09-294<br>Electronic Filing |

## MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff Cathy Thompson ("Thompson") brings this action pursuant to 42 U.S.C. § 1383(c)(3), seeking judicial review of the final determination of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("Act") [42 U.S.C. §§ 1381-1383f]. The parties have filed cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the record has been developed at the administrative level. For the reasons that follow, plaintiff's motion will be granted, defendant's motion will be denied, the decision of the Commissioner will be reversed, and the matter will be remanded with direction to grant benefits consistent with an onset date of February 13, 2006.

## II. PROCEDURAL HISTORY

Thompson protectively applied for SSI benefits on October 26, 2005, alleging disability as of February 22, 2001. R. 17, 57, 82. The application was administratively denied on February 27, 2006. R. 43. Thompson responded on April 24, 2006, by filing a timely request for an administrative hearing. R. 48. On October 9, 2007, a hearing was held in Johnstown, Pennsylvania, before Administrative Law Judge Patricia C. Henry (the "ALJ"). R. 512. Thompson, who was represented by counsel, appeared and testified at the hearing. R. 516-546. Testimony was also taken from Irene Montgomery ("Montgomery"), an impartial vocational expert. R. 546-550. During the course of the hearing Thompson amended her alleged onset date to October 26, 2005, which had been her protective filing date. R. 63, 521-522. In a decision

1

dated December 27, 2007, the ALJ determined that Thompson was not "disabled" within the meaning of the Act. R. 14-30. The Appeals Council denied Thompson's request for review on January 28, 2009, thereby making the ALJ's decision the final decision of the Commissioner in this case. R. 6. Thompson commenced this action on March 9, 2009, seeking judicial review of the Commissioner's decision. Doc. No. 1. Thompson and the Commissioner filed motions for summary judgment on September 15, 2009, and October 14, 2009, respectively. Doc. Nos. 10 & 12. These motions are the subject of this memorandum opinion.

### III. STATEMENT OF THE CASE

The documentary record indicates that Thompson suffers from multiple impairments. On October 8, 2002, she underwent surgery to alleviate symptoms associated with carpal tunnel syndrome in her right wrist. R. 310-312. The operation was performed by Dr. Gregg L. Goldstrohm. R. 310-312. Thompson evidently fell into a bathtub later that night, inadvertently immersing her right hand in water. R. 311. Dr. Goldstrohm redressed her right hand the next day. R. 311. Thompson's sutures were removed on October 18, 2002. R. 310. On November 26, 2002, Dr. Goldstrohm performed surgery to alleviate symptoms associated with carpal tunnel syndrome in Thompson's left wrist. R. 309. The sutures from Thompson's second carpal tunnel operation were removed on December 6, 2002. R. 308. Thompson was instructed to wear a splint. R. 308. As of February 21, 2003, Thompson was still experiencing "basilar incision pain." R. 307. Dr. Goldstrohm started her on "a therapy program for range of motion, desensitization and scar massage." R. 307.

Thompson suffers from gastroesophageal reflux disease ("GERD"), Barrett's esophagus, and chronic dysphonia due to acid reflux laryngopharyngitis. R. 19. On January 20, 2003, a biopsy of her esophagus revealed that she was suffering from acute and chronic inflammation. R. 19-20, 135-137, 144. Dr. Augusto Sotelo reported on January 28, 2003, that Thompson had reflex laryngitis. R. 144. It was recommended that Thompson take antireflex medication. R. 144.

Thompson underwent a laparoscopic Nissen fundoplication on July 31, 2003. R. 154. The procedure was performed by Dr. Robert Keenan. R. 154. During a March 29, 2004,

appointment with Dr. Juan Lora, Thompson complained about having "severe gas." R. 154. Dr. Lora advised Thompson to avoid eating "gas-producing foods," to chew her food well, to eat more slowly, and to take anti-gas medication. R. 154. An x-ray of Thompson's chest yielded normal results. R. 154.

Thompson sought treatment from Dr. Daniel L. Haffner for foot ailments. On May 7, 2004, Thompson reported that she had been experiencing pain in her lower left extremity for several months. R. 164. This consisted of pain throughout her left knee, foot and heel. R. 164. Dr. Haffner's examination revealed that Thompson's plantar fascia was tender. R. 164. Thompson was given separate cortisone injections to relieve the pain in her knee and heel. R. 164. She indicated on June 22, 2004, that the pain in her knee had been somewhat relieved by the injection, but that the pain in her heel had not been relieved at all. R. 163. Dr. Haffner suggested that Thompson take oral anti-inflammatory medications and wear a fixed Walker boot. R. 163.

Thompson returned to Dr. Haffner's office on August 27, 2004, reporting that neither the medications nor the Walker boot had alleviated the pain in her left heel. R. 162. Another cortisone injection was administered. R. 162. Although Thompson experienced momentary relief, her pain persisted. R. 161-162. An additional cortisone injection was administered on September 10, 2004, but it did not provide Thompson with long-term relief. R. 160-161. On October 19, 2004, Thompson told Dr. Haffner that she experienced pain whenever she needed to spend extended periods of time on her feet. R. 160. A magnetic resonance imaging ("MRI") scan was recommended to ascertain the source of Thompson's heel pain. R. 160.

The MRI scan, which was conducted on November 10, 2004, revealed that Thompson had a moderate-sized plantar calcaneal spur and minimal plantar fasciitis. R. 165-166. Thompson was also experiencing pain in her lower back. R. 159. An MRI scan of her lumbar spine showed that she had multiple "bulging" discs. R. 159. On November 19, 2004, Dr. Haffner told Thompson that he had no further medical suggestions. R. 159. He indicated that Thompson simply needed to decrease her level of activity. R. 159.

Thompson's foot problems apparently continued throughout the ensuing year. Shock

wave therapy conducted on March 14, 2005, initially improved Thompson's heel pain by roughly 50%. R. 194. As of September 6, 2005, however, her pain had returned. R. 194. An endoscopic plantar fasciotomy was performed on September 26, 2005. R. 192-193. The procedure was performed by Dr. James Montgomery. R. 192-193.

Dr. Maria J. Sunseri referred Thompson for a polysomnography, which was conducted on August 9, 2005. R. 255-258. Dr. Bharat Jain reported that Thompson was suffering from obstructive sleep apnea syndrome. R. 257. Thompson underwent an ultrasound of her thyroid on September 19, 2005. R. 252. Her thyroid was found to be mildly enlarged. R. 252. The ultrasound was conducted because a goiter had previously been found. R. 252. A mammogram conducted on September 22, 2005, revealed that Thompson had a well-defined lesion on the posterior of her right breast. R. 251. She was advised to undergo a follow-up mammogram in six months. R. 251.

Dr. Donald P. Breneman performed an outpatient psychiatric evaluation of Thompson on September 22, 2005. R. 187-188. He indicated that Thompson was suffering from a dysthymic disorder. R. 188. Thompson's Global Assessment of Functioning ("GAF") rating was between 55 and 60. R. 188.

Thompson underwent a thyroidectomy on January 10, 2006. R. 411-412. The procedure was performed by Dr. Mark Klingensmith. R. 411-412. The resulting pathology yielded benign results, "showing a follicular hyperplasia without malignancy." R. 20, 379.

On February 13, 2006, Dr. Geneen Dashefsky performed a consultative physical examination of Thompson. R. 228-236. He indicated that Thompson was suffering from "restless leg syndrome," which significantly inhibited her ability to work. R. 228. Dr. Dashefsky reported that Thompson could frequently lift or carry objects weighing up to twenty pounds, but that she could only sit, stand or walk for one to two hours during the course of an eight-hour workday. R. 235. He further stated that Thompson could engage in only occasional bending, kneeling, stooping, crouching, balancing or climbing. R. 236.

On March 7, 2006, it was determined that Thompson had cysts on her liver. R. 459. An epidermal inclusion cyst was surgically removed from Thompson's left breast on April 13, 2006.

R. 449-451. It had apparently appeared three months earlier. R. 451. Thompson's decision to have it removed was influenced by the fact that it had increased in size and produced drainage. R. 451.

Thompson underwent a lung biopsy at Westmoreland Regional Hospital on July 6, 2006. R. 491-494. The biopsy was conducted because of bilateral pulmonary nodules that had been found on Thompson's lungs. R. 491-492. It was determined that Thompson was suffering from Langerhans cell histiocytosis. R. 341. She had previously been smoking on a regular basis, but she was warned by Dr. Steven F. Wodzinski that she needed to quit smoking in order to improve her pulmonary condition. R. 341.

In a letter to Dr. Mark Gottron, Thompson's primary care physician, dated August 1, 2006, Dr. David A. Kenney reported that Thompson had been complaining of "aching and swelling in both legs." R. 281. In a second letter to Dr. Gottron dated February 20, 2007, Dr. Kenney stated that Thompson had "symptomatic venous insufficiency involving both lower extremities." R. 280. Doppler studies performed on July 23, 2007, revealed that Thompson was not suffering from deep vein thrombosis in her right lower extremity. R. 293.

On April 17, 2007, Thompson underwent a stress test at Westmoreland Regional Hospital. R. 334. The test showed "a nontransmural myocardial infarction with significant peri-infarct ischemia." R. 329. Because of these findings, Dr. Bassam K. Kharma recommended that Thompson undergo a cardiac catheterization. R. 329. The procedure was conducted on April 27, 2007. R. 331-332. The cardiac catheterization showed that Thompson was not suffering from coronary artery disease. R. 328.

Dr. Klingensmith diagnosed Thompson as suffering from bilateral vocal cord kyperkeratosis. R. 20, 413. Thompson underwent surgery to alleviate the symptoms of this condition on June 5, 2007. R. 413. After the surgery, her larynx was stable, and she experienced an improvement to her voice. R. 395. On June 15, 2007, Dr. Montgomery surgically removed toenails from Thompson's right foot at Mercy Jeannette Hospital. R. 290-291. This procedure was performed because Thompson's toenails had become dystrophic and painful, making it difficult for her to wear shoes. R. 290.

Thompson also suffers from a ganglion cyst on her right wrist. R. 306. On May 30, 2007, Dr. Goldstrohm recommended that Thompson undergo an MRI scan to ascertain the nature of a mass located on her right wrist. R. 305. The MRI scan, which was conducted on June 19, 2007, confirmed that the mass was a ganglion cyst. R. 304. An injection to alleviate Thompson's symptoms was administered on June 25, 2007. R. 303. Dr. Goldstrohm administered a second injection on September 10, 2007. R. 302. He did not recommend the surgical removal of the ganglion cyst, since there was a high probability that Thompson would experience a recurrence in any event. R. 302.

At the hearing, Thompson testified that she had stopped working in 1999 because of her restless leg syndrome and plantar fasciitis. R. 518. She explained that she had experienced pain while walking, and that her job had required her to stand for most of the day. R. 518. According to Thompson's testimony, she had previously worked at Nutty Bavarian, which was owned by her sister, but she had been unable to work the full-time schedule that her sister wanted her to work. R. 523. Her employment at Nutty Bavarian ended because of her inability to work for extended periods of time. R. 523. She later worked for Ceramics & More on a part-time basis, but she evidently left that job because of her standing and walking difficulties. R. 518, 523.

Thompson also described her symptoms at the hearing. She asserted that she would fall asleep because of the side effects of her medications, and that she could not complete a full workday. R. 523-525. Thompson declared that she had declined to renew her driver's license because of instances in which she had almost fallen asleep while driving. R. 530. She testified that her restless leg syndrome essentially prevented her from sitting, standing or walking for an extended period of time. R. 524-525. Thompson further stated that her hand impairments had sometimes prevented her from holding onto things. R. 528-529. She explained that she could not lift a heavy pot of water, and that paint brushes would sometimes fall out of her hands while she was trying to paint. R. 529. Thompson's subjective complaints are corroborated by treatment notes submitted by some of her treating physicians. R. 286, 300, 319, 324.

## IV. STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is

6

"supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565,108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d

7

955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v.*

*Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V. THE ALJ'S DECISION

The ALJ determined that Thompson had not engaged in substantial gainful activity subsequent to the date of her application, which was also her amended onset date. R. 19. Thompson was found to be suffering from restless leg syndrome, sleep apnea, degenerative joint disease of the knees, degenerative disc disease, arthritis, obesity, depression, a ganglion cyst, and a shoulder injury. R. 19. Although these impairments were deemed to be "severe" within the meaning of 20 C.F.R. § 416.920(a)(4)(ii), they did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing"). R. 19-22. In accordance with 20 C.F.R. § 416.945, the ALJ determined that Thompson could perform a full range of light unskilled work. R. 22, 28.

Thompson was born on February 17, 1955, making her fifty years old as of the date of her application and fifty-two years old as of the date of the ALJ's decision. R. 28, 82. She was classified as a "person closely approaching advanced age" under the Commissioner's regulations. 20 C.F.R. § 416.963(d). She had a high school education and an ability to communicate in English. R. 29, 72; 20 C.F.R. § 416.964(b)(4)-(5). Although Thompson had previously worked on a part-time basis for Ceramics & More and Nutty Bavarian, such work activity did not amount to substantial gainful activity. R. 28, 518. Therefore, Thompson had no past relevant work. 20 C.F.R. § 416.960(b)(1). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that a finding of "not disabled" was directed by Medical-Vocational Rule 202.13, which is contained in 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "Medical-Vocational Guidelines" or "Rules"). R. 29. Alternatively, the ALJ concluded that Thompson could work in a scales operator, small parts assembly, cashier, toll collector, or parking garage attendant position. R. 29. Montgomery's testimony established that these jobs existed in the national economy for purposes of 42 U.S.C. § 1382c(a)(3)(B). R. 547.

## VI. DISCUSSION

9

Thompson argues that the ALJ erred in failing to credit Dr. Dashefsky's opinion that she only can sit, stand or walk for one to two hours during an eight-hour workday. Doc. No. 11 at 7-16. She points out that if she had been deemed to be capable of performing only sedentary work, a finding of "disabled" would have been directed by Medical-Vocational Rule 201.12. Doc. No. 11 at 6. Thompson assails the ALJ's finding that she was capable of performing a full range of light, unskilled work. Doc. No. 11 at 7-16.

The argument raised by Thompson can only be understood by reference to the Commissioner's regulations defining the terms "sedentary work" and "light work." The applicable regulations provide:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
> (b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(a)-(b). Although the ALJ determined that Thompson was capable of performing light work, Thompson argues that she actually was capable of performing only sedentary work.

A claimant's residual functional capacity is relevant at both the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. § 416.945(a)(5)(i)-(ii). Since Thompson had no past relevant work, the ALJ's analysis immediately proceeded to the fifth step after it was determined that Thompson could engage in a full range of light unskilled work. R. 28. "At the fifth step, the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203,

205 (3d Cir. 2003). Where the claimant's residual functional capacity is not materially different from that of a large class of other individuals, the Commissioner's burden can be satisfied solely by reference to general guidelines such as the Medical-Vocational Rules or Social Security Rulings. *Heckler v. Campbell*, 461 U.S. 458, 467-470, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983); *Allen v. Barnhart*, 417 F.3d 396, 405-408 (3d Cir. 2005). Conversely, where the claimant's residual functional capacity is relatively unique, the Commissioner can satisfy his burden only by producing evidence (i.e., vocational expert testimony) establishing the existence of jobs in the national economy that do not require the performance of tasks which are precluded by the claimant's functional limitations. *Sykes v. Apfel*, 228 F.3d 259, 273 (3d Cir. 2000). In this case, the ALJ appears to have relied on both Medical-Vocational Rule 202.13 and the existence of jobs specifically identified by Montgomery in determining that Thompson was not statutorily disabled. R. 29-30.

In determining that Thompson was capable of performing light work, the ALJ specifically rejected Dr. Dashefsky's consultative opinion by stating as follows:

> Upon review of the evidence, including the physical examination findings by Dr. Dashefsky, I find insufficient support to find that claimant is limited to standing and walking for only two hours in an eight hour day or that claimant is limited to sitting only one to two hours in an eight hour day. It appears that his opinion is based primarily on the claimant's subjective complaints and statements. Therefore, great weight has not been given to these standing, walking and sitting limitations.

R. 27-28. It is worth noting that, in addition to the limitations specifically referenced (and rejected) by the ALJ, Dr. Dashefsky found Thompson to be capable of only *occasional* bending, kneeling, stooping, crouching, balancing or climbing. R. 236. The ALJ never explained why she rejected the postural limitations identified in Dr. Dashefsky's consultative examination report. R. 27-28.

In a letter to Dr. John Doran accompanying his examination report, Dr. Dashefsky stated:

> She tells me that the main problem she feels inhibits her ability to work is her restless leg syndrome. She was currently treated with Mirapex for this. She tells me that she has a chronic leg pain and cramping sensation in both legs. Somewhat unusual is that she has her symptoms during the day as well, not just at night when she lies down. She tells me that she has to frequently change positions from sitting to standing to lying in order to get comfort or relief. When she gets

11

> the pain and cramps in her legs, it often travels superiorly up her leg and into the low back. She also has problems with the left knee. She has discomfort with the knee, particularly when she's standing for periods of time, or with going up and down stairs.

R. 228. These statements indicate that Dr. Dashefsky may have been influenced by Thompson's subjective complaints when he rendered his opinion concerning her functional limitations. Nevertheless, the "medical source statement" completed by Dr. Dashefsky was prefaced by an instruction reading as follows:

> Doctor: Please assess the claimant's ability to engage in full-time employment in a regular work setting. You should consider the combined effects of all impairments, the side effects of any medication, and the effects of symptoms (e.g., pain, fatigue, etc.) The ASSESSMENT SHOULD REFLECT MAXIMUM SUSTAINABLE PHYSICAL CAPACITY, not a median or minimum. Your opinion should be based on clinical signs and laboratory findings, NOT ON THE INDIVIDUAL'S STATEMENTS.

R. 235 (capitalization in original). This instruction, which appears on a standard "medical source statement" form, indicates to a consultative examiner that he or she is supposed to render an opinion based on his or her own examination findings rather than on the claimant's subjective complaints.

Thompson implicitly concedes that Dr. Dashefsky's consultative opinion was partially based on her subjective complaints. Doc. No. 11 at 14. Nevertheless, she goes on to state that the mere fact that Dr. Dashefsky's opinion was partially based on "subjective information" does not mean that it was incorrect. Doc. No. 11 at 14. Thompson's argument finds support in prior decisions rendered by federal courts. It is difficult to conceive of a medical examination involving a conscious, competent individual that does not include some degree of verbal communication between the examiner and the person being examined. The fact that a physician's examination findings are informed (and somewhat influenced) by an individual's subjective complaints does not render those findings unreliable. *Gossett v. Bowen*, 862 F.2d 802, 806 (10th Cir. 1988)("While a medical examination necessarily involves a subjective element (an evaluation of the credibility of the patient's subjective complaints of pain), it is also based on an observation of the patient and an evaluation of his medical history, and thus may constitute the

12

necessary objective medical evidence which must support a claim of disabling pain."). It is generally improper for an administrative law judge to reject the findings of a consultative examiner *solely* on the ground that they are based on a claimant's subjective complaints where, as here, there is nothing in the record to suggest that the consultative examiner relied more on the claimant's subjective complaints than on his or her own clinical observations in determining the nature of the claimant's functional abilities and limitations. *Ryan v. Commissioner of Social Security*, 528 F.3d 1194, 1200 (9th Cir. 2008). The United States Court of Appeals for the Third Circuit has indicated that an administrative law judge may consider the reliability of previous reports supplied by a particular physician in determining the weight to be given to that physician's report in a subsequent case. *Williams v. Sullivan*, 970 F.2d 1178, 1185, n. 5 (3d Cir. 1992). There is nothing in the evidentiary record of this case, however, which suggests that Dr. Dashefsky has shown a tendency to give undue weight to the subjective complaints expressed by claimants in rendering consultative opinions concerning their ability or inability to work.

On February 22, 2006, a nonexamining medical consultant opined that Thompson was capable of engaging in a full range of light work.[1] R. 110-117. The consultant apparently did not have access to Dr. Dashefsky's examination report, since the record contains a written indication that the consultant's opinion was not in conflict with that of a treating or examining physician. R. 116. A well-supported report of a nonexamining medical consultant can be credited over an unsupported report of a treating or examining physician under circumstances in which the report of the treating or examining physician is "internally contradictory." *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). In this case, however, Dr. Dashefsky's examination report was not inconsistent with the information supplied by Thompson's treating physicians. Moreover, even if that were not the case, the report of the nonexamining medical consultant could not sustain the ALJ's decision, since the ALJ never referenced that report in her opinion. *Fargnoli*, 247 F.3d at 44, n. 7 (recognizing that a reviewing court cannot affirm a decision of the Commissioner denying a claim for Social Security disability benefits on a ground other than that actually relied

---

[1]The name of this nonexamining medical consultant is illegible. R. 117.

upon by the Commissioner in making his decision).

The United States Court of Appeals for the Third Circuit has stated that the Commissioner "must give serious consideration to a claimant's subjective complaints" even where such complaints "are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). In light of this principle, it follows *a fortiori* that the Commissioner must give serious consideration to a claimant's subjective complaints where such complaint *are* supported by objective evidence. In this case, the record is replete with documentary evidence corroborating Thompson's testimony. Thompson testified that she had not renewed her driver's license because of her inability to stay awake while driving. R. 530. Her sleepiness is extensively documented in Dr. Sunseri's treatment notes. R. 198-199, 284-286, 288. In a letter to Dr. Gottron dated February 1, 2007, Dr. Jain specifically opined that Thompson would fall asleep if she were to ride in a car as a passenger for an uninterrupted one-hour period. R. 324. Thompson explained that her hand impairments had often caused her to drop paint brushes while she was trying to paint. R. 529. Documentation provided by Dr. Arthur T. Androkites indicates that Thompson endured such problems as early as 2002. R. 300. Although some of Thompson's symptoms may have been alleviated by the surgery that she had to address her carpal tunnel syndrome, the record indicates that as late as September 10, 2007, Dr. Goldstrohm advised against surgery to remove the ganglion cyst on Thompson's right wrist. R. 302. Thompson further described her restless leg syndrome as an impediment to her ability to stand, stating that she had been forced to quit her earlier job because of that impairment. R. 518. On October 24, 2006, Dr. Sunseri noted that Thompson's restless leg syndrome may have been contributing to her sleeping difficulties. R. 285. As early as November 19, 2004, Dr. Haffner advised Thompson to decrease her level of activity in order to alleviate her foot pain. R. 159. All of this evidence provides support for Thompson's subjective complaints.

The Commissioner argues that Thompson's daily activities support the ALJ's finding that Thompson was capable of performing light work. Doc. No. 13 at 1-2, 10-11. Specifically, the Commissioner contends that Thompson's ability to work can be verified by her abilities to care for her dog, wash her clothes, wash dishes, dress herself, shower without resting, dial a telephone

number, operate a television with a remote control device, and make her bed. Doc. No. 13 at 10-11. This argument is manifestly unpersuasive. First of all, the United States Court of Appeals for the Third Circuit has held that it is improper for an administrative law judge to rely *solely* on a claimant's sporadic activities in order to reject competent medical evidence indicating that the claimant is disabled. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). Second, the Commissioner's characterization of the testimonial record does not paint a true picture of the testimony actually given by Thompson at the hearing. Although Thompson testified that she sometimes washed her own clothes, she clarified that she could not carry a basket of clothes from one floor to the next. R. 532-533. While she stated that she washed her own dishes, she indicated that she needed to rest intermittently while doing so because of her inability to stand for long periods of time. R. 533. Thompson further testified that she was able to shop for groceries only when accompanied by someone who could take the purchased products from a shopping cart to a car, and then from the car to her house. R. 533. The Commissioner points out that Thompson is a "very artistic person," suggesting that her ability to create pieces of art evinces a corresponding ability to engage in substantial gainful activity. Doc. No. 13 at 1. At the hearing, however, Thompson testified that she could only paint for approximately ten to fifteen minutes at a time, and that she sometimes abandoned projects altogether because of her inability to continue painting. R. 544-545. The sporadic activities engaged in by Thompson do not undermine her claim for SSI benefits. A claimant need not "vegetate in a dark room excluded from all forms of human and social activity" in order to establish his or her entitlement to benefits under the Act. *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981).

As noted earlier, the ALJ rejected not only Dr. Dashefsky's finding that Thompson could sit, stand or walk for only one to two hours during the course of an eight-hour workday, but also his finding that Thompson could engage only in occasional bending, kneeling, stooping, crouching, balancing or climbing. R. 27-28, 235-236. The ALJ never mentioned the postural

limitations which had been identified by Dr. Dashefsky.[2]  R. 27-28.  She did not specifically rely on the report of the nonexamining medical consultant.  Even if she had done so, the record indicates that the consultant was never made aware of Dr. Dashefsky's examination findings in any event.  R. 116.  The only other opinion evidence contained in the record concerning Thompson's ability (or inability) to work consists of statements signed by Dr. Gottron indicating that Thompson was "permanently disabled" as early as September 16, 2004.  R. 273-278.  The ALJ rejected Dr. Gottron's opinion on the ground that it was unsupported by objective findings. R. 28.

Admittedly, an opinion expressed by a treating physician as to whether a particular individual is disabled is not entitled to significant weight, since the ultimate question of disability is reserved for the Commissioner's determination.[3]  *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990).  Nevertheless, the record contains no evidence that a treating or examining physician expressed an opinion contradicting those expressed by Dr. Dashefsky and Dr. Gottron.

Under the present circumstances, the ALJ's residual functional capacity determination cannot stand.  The only remaining question is whether an immediate award of benefits is warranted, or whether this case should be remanded for further administrative proceedings.  A

---

[2] In light of Thompson's multiple impairments, it cannot be said that the evidence concerning her postural limitations was so overwhelmed by countervailing evidence that the ALJ could not have been expected to give it serious consideration.  *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 203-205 (3d Cir. 2008).

[3] Conversely, "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales, 225 F.3d at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)); see also Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989); Podedworney v. Harris, 745 F.2d 210, 217-18 (3d Cir. 1984). And reports from consulting physicians who have examined the claimant and rendered assessments on conditions within their respective area of expertise are to be given appropriate evidentiary weight, which will vary based on the circumstance and the other medical evidence presented.  Gordils v. Secretary of Health and Human Services, 921 F.3d 327, 328 (1st Cir. 1990) (citing Rodriguez v. Secretary of Health and Human Services, 647 F.2d 218, 223 (1st Cir. 1981) (weight to be afforded a consulting/examining physician's report "will vary with the circumstances, including the nature of the illness and the information provided the expert."). For example, where the consulting/examining physician's report constitutes the only probative medical evidence on the condition in question, it may be entitled to great or even controlling weight. See Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995) (examining physician's report accorded significant weight where it was only medical assessment on point and corroborated by other evidence).

judicially-ordered award of benefits is proper only where the administrative record of a case has been fully developed, and where the record as a whole indicates that the claimant is statutorily disabled. *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). That standard is met here. Consultative medical examiners bring both expertise and impartiality to the adjudicatory process. *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985). Dr. Dashefsky, a consultative medical examiner, indicated that Thompson could not sit, stand or walk for more than one to two hours during the course of an eight-hour workday. R. 235. The "medical source statement" form that Dr. Dashefsky completed contained a statement clearly admonishing him to render an opinion based on his own examination findings, and not simply on Thompson's subjective complaints. R. 235. The limitations found by Dr. Dashefsky, if credited, would point to a finding that Thompson was capable of performing only sedentary work. 20 C.F.R. § 416.967(a)-(b). As Thompson points out, a finding of "disabled" is directed by Medical-Vocation Rule 201.12 for an individual with her vocational background who is limited to sedentary work. 20 C.F.R. Part 404, Subpart P, Appendix 2, Table No. 1, Rule 201.12. Furthermore, Montgomery testified at the hearing that an individual's inability to sit or stand for more than four hours per workday would seriously compromise his or her ability to engage in substantial gainful activity. R. 550. Accordingly, this case will be remanded to the Commissioner solely for the calculation of SSI benefits owed to Thompson under Title XVI.

## VII. CONCLUSION

Aside from a report provided by a nonexamining medical consultant who was unaware of Dr. Dashefsky's examination findings, the record contains no opinion evidence indicating that Thompson was capable of performing light work during the relevant period of time. Dr. Dashefsky's examination findings are consistent with both the documentary evidence supplied by Thompson's treating physicians and the testimony given by Thompson at the hearing. A reliable residual functional capacity determination must account for all of a claimant's "medically undisputed" limitations. *Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002). The decision of the Commissioner is not "supported by substantial evidence." 42 U.S.C. § 405(g).

The Act describes disability as the inability to engage in substantial gainful activity by

reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week. Dobrowolsky v. Califano, 606 F.2d 403, 408 (3d Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis. Plaintiff had the burden of making out a prima facia case that he was disabled within in the meaning of the Act. Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a). This burden generally is met where the record clearly substantiates a claimant's subjective claim that he or she has an impairment which prevents the claimant from engaging in substantial gainful activity. Rossi v. Califano, 602 F.2d 55 (3d Cir. 1979). Here, the substantial evidence of record supports only the conclusion that plaintiff could not engage in such activity as of February 13, 2006, when Dr. Dashefsky indicated that the limitations from plaintiff's multiple impairments prevented her from meeting the demands of substantial gainful activity at the light level on a regular and sustained basis. This assessment was corroborated by an assessment from plaintiff's treating physician and the remaining medical evidence of record. Accordingly, to the extent the ALJ's findings and conclusions reflected a determination that plaintiff was not disabled at or after that point in time they were not supported by substantial evidence. As a result, plaintiff's motion for summary judgment must be granted in part and the matter will be remanded to the Commissioner with direction to grant benefits consistent with an onset date of February 13, 2006.

An appropriate order will follow.

Date: June 21, 2010

       s/ David Stewart Cercone
       David Stewart Cercone
       United States District Judge

cc:    All counsel of record